The United States v. Johnson and Lange Here's Miracle. Rachel Miracle If it please the court, Rachel Miracle from the Center for Constitutional Rights and along with my colleagues at the People's Law Office and the Federal Defender's Office, I represent defendants, appellants in this appeal. This appeal involves three claims that establish the facial invalidity of the Animal Enterprise Terrorism Act. I'll begin with our overbreath challenge to provision A2A of the statute. Overbreath begins by examining what the statutory provision means. A2A prohibits damaging or causing the loss of any real or personal property, including animals or records, used by an animal enterprise. The dictionary definition of property includes money and intangible property, like future profits or business goodwill. Thus, under the dictionary definition of the words of A2A, the provision prohibits causing a business to lose money or lose profit. Now this dictionary definition is confirmed by the federal statutes we've cited, which when they mean to exclude intangible property. It's also confirmed by the way the Third Circuit interpreted the same provision in the Animal Enterprise Protection Act in the Fulmer case. The district court and the government don't really disagree that that's what the plain meaning of A2A says. Rather, the court looked at the way the liability provision in the statute interplays with the penalty provision. Penalties under the Animal Enterprise Terrorism Act are based on the amount of economic damage that a defendant causes. And the district court looked at the fact that Congress used the words economic damage, which it defined to include loss of property or increased costs in the penalty provision, and didn't use the phrase economic damage in the liability provision, and reasoned that Congress must have intended not to allow for liability based only on causing economic damage. But this is a misuse of the Russello and the Bates line of cases from the Supreme Court on which the district court relied. Those cases stand for the proposition that when Congress uses one phrase in one part of the statute, and another phrase in another part of the statute, the court should not interpreting different phrases to mean the same thing fails to give effect to Congress's intent in using two different phrases. But here, nobody is arguing that the two different phrases in the statute mean the same thing. One, damaging or causing the loss of any real or personal property, is incredibly broad. It naturally includes the more narrow act of causing economic damage. Because we can interpret the two different phrases in their natural meaning to mean different things, the Russello and Bates line of cases has no effect here. In fact, Russello involves a somewhat similar interpretation question where the court was faced with the question of whether any interest acquired by a person should be interpreted to mean the same thing as any interest in an enterprise. One is broader, and one is more narrow. And the Supreme Court said, well, we can't interpret them to mean the same thing, because that would fail to give effect to the fact that Congress used different words here. All that that presumption means for the Animal Enterprise Terrorism Act is that the court should not presume that damaging or causing the loss of any property is limited to causing economic damage. There is no reason under the Russello and Bates presumption to interpret A2A to exclude causing economic damage. Rather, that requires a rewriting of the statute. Now, the district court also looked to the word used and the fact that used appears in A2A. But even if the district court was right that one doesn't use intangible property in the same way one uses tangible property, that only limits the provision's application to causing the loss of future profits. It doesn't limit A2A's application to causing the loss of money. Money is currently held property, which the district court and the government agreed below a company can use in the present tense. Moreover, used doesn't appear in the second provision of the statute, in the second clause of the provision, where the AETA protects property that belongs to an enterprise that has some sort of connection with an animal enterprise. So it would actually, if you interpreted the statute that way, it would actually mean that only the tangible property of an animal enterprise is protected while all the property. Well, isn't the more natural reading of the statute is the offense requires damage to damages. And then once the damage is shown, the penalties provision takes into account the wider range of effects of the defendant's conduct, including lost profits. Well, that's how the district court read it, Your Honor, but we disagree that that's the more natural reading. The statute doesn't just say damage property. It says damage or cause the loss of property. And while the government has implied that the plain language of that provision could be interpreted to limit its application to tangible property, they've never cited a single case or a single statute or a single dictionary where property was defined to exclude money or exclude intangible property. So they may say it's the more natural reading, but I don't understand how those words could possibly mean that thing unless you do as the district court did and say, no, we have to look at the context of the penalty provision as well. But even when you're comparing the liability provision and the penalty provision, the Bates and the Rosello presumption that the district court used only means that court should not presume that two different phrases in a statute mean the same thing. And that's not what anybody is arguing here. Now, the district court also looked at the fact that certain economic damage is carved out from the definition of economic damages that can give rise to penalty under the statute. Specifically lawful economic disruption resulting from lawful public governmental or business reaction to disclosure of information about an animal enterprise doesn't qualify to increase penalties under the act. And the district court said, you know, it wouldn't make sense for Congress to carve out that type of loss as not giving rise to penalty, but allow it to give rise to liability. But the court cannot interpret a statute differently from its plain meaning based on failing to understand Congress's rationale in making a certain choice. That's an invasion of the legislative domain. There is no actual ambiguity in the statute here. And because there's no actual ambiguity, the overbreath of A2A is clear. A2A prohibits causing a business to lose money or profit, and that is incredibly overbroad. Given that interpretation of the provision, the rule of construction, which the district court also relied on to corroborate its interpretation of A2A, cannot save the statute, because the district court recognized that the court must interpret A2A first, and only then, if it finds that A2A is legitimately open to two different readings, should the court look at the rule of construction. But using the rule of construction to save A2A in the first instance would be using a First Amendment exception to save an otherwise invalid statute, and the government concedes that cannot occur. Unless the court has other questions about overbreath, I'll move on. I want to briefly mention our overbreath challenge to A2C of the statute, and just provide the court with an update, which is that, as you're aware, we relied on a preliminary trial memo that had been submitted in the Buddenburg ADA prosecution out of California. In that prosecution, the prosecution interpreted A2C as we do here, to only criminalize a conspiracy or attempt to travel in interstate commerce, and damage or interfere with the operations of an animal enterprise. Since briefing in this case, one of the defendants in that case has withdrawn her guilty plea and moved to dismiss the indictment based on similar arguments as are before this court. And the government, in response, has indicated that it was wrong when it submitted its preliminary trial memo, that its interpretation of A2C was an error, and it doesn't intend to move forward on that ground. And they've since issued a superseding indictment in the case. I mention this just to update the court. It doesn't actually change the relevance of the fact that a prosecution, a prosecutor, looking at the words in A2C, read it just as we do, to mean that the elements of the crime are a conspiracy or an attempt to damage or interfere with the property of an animal enterprise and some action in interstate commerce. And that's incredibly broad. If a prosecutor reads it that way, chances are someone not before the court will read it that way as well and be chilled. Moving on to our vagueness challenge, Your Honors. We challenge the Animal Enterprise Terrorism Act as facially void for vagueness. But here it's only a crime if one acts with the purpose of damaging or interfering with the operations of an animal enterprise. Why doesn't that requirement alleviate the vagueness concerns? I think a notice, an intent requirement, can really only save a statute from vagueness when you're moving under the first prong of the vagueness standard, that it fails to give proper notice to a defendant of what the conduct is that's criminalized. But we're moving under the second prong of vagueness, which courts recognize is an independent reason for a statute to be facially vague. And that's that it's so standardless as to fail to provide any guidance for law enforcement discretion. It invites arbitrary and discriminatory enforcement. And in that context, it doesn't seem to make any sense that an intent requirement would be relevant. The question is whether there are standards to guide law enforcement discretion. In this case, the district court said, you know, it's not vague because the law doesn't allow law enforcement to determine what kind of conduct amounts to a crime. The crime itself is clearly defined. But the same could be said for metropolitan distributors, which we cited in our briefs. That's the case with the prohibition on idling by a motor vehicle. The criminal conduct was clear.  The problem was that that sort of conduct occurred so broadly that there was no standards for law enforcement to determine which vehicles to cite. Should they cite... Ms. Meeropol, you wouldn't think those factual settings in that case, in this case, are at all close on the question of... That's quite true, Your Honor. It's a very different factual scenario. I... You know, desert rain, perhaps, is a closer factual comparison to this case that also involved arbitrary and discriminatory enforcement as an independent reason for facial vagueness. Now, in that case, there was a Los Angeles ordinance aimed at the homeless population. But the law was written in a way that was so broad that it applied to conduct that many people engage in every day. And yet, it was only used against the homeless population. Well, let's talk about prosecutorial discretion for a second. Could you raise some kind of hypothetical that might help the court in where this could be misused? Well, I think... In the setting, you know, that the statute attempts to address. Yes. I think, if I understand your question, Your Honor, I think looking at the history of enforcement of this statute shows that arbitrary and discriminatory enforcement is, in fact, occurring. You know, the Animal Enterprise Terrorism Act actually criminalizes every property offense against a grocery store, a clothing store, or a restaurant in the entire country as long as there's an interstate component. It has only ever been used against animal rights activists. What other groups might be targeted? What other groups might be targeted, Your Honor? Yeah. What could be targeted? Well, I think the problem is that the law actually federalizes such a broad swath of criminal activity. So at argument before the district court, the government agreed that throwing a rock through the window of a Whole Foods, for example, if there's an interstate component, would count as a violation of the statute. Any property damage, the law does not require the purpose of interfering or damaging an animal enterprise because it's an animal enterprise. That's not a part of the purpose. It just requires that that damage occur and the damage itself be intentional. Does anybody think that is the intent? Well, I don't know that the intent matters there, Your Honor. I mean, that's exactly what the Ninth Circuit looked at in Desert Rain. Right there, the Ninth Circuit said, this is a law that was clearly intended to deal with the problem of the homeless using their cars to sleep in, right? But because the words of the law actually apply to so much more conduct, the fact that the government is using it only against the homeless population is not just inviting arbitrary and discriminatory enforcement. That actually is arbitrary and discriminatory enforcement. See, I have a big problem when you look at even the definition of an animal enterprise is pretty clear. A commercial or academic enterprise is it uses or sells animals or animals for profit, food, blah, blah, blah, a zoo, aquarium, animal shelter, blah, blah, blah. Any fair or significant event intended to advance agricultural arts and sciences, I mean, the statute is pretty clear for the purpose of damaging or interfering with operations of an animal enterprise with an intentional element. And when we talk about prosecutorial discretion, when we look at the facts here, traveling interstate to release 2,000 minks from their cages, destroying the minks' breeding cards, pouring caustic substances over the two farm vehicles, I mean, this is the kind of crime that I think this anticipates. And I have a hard time seeing where it's vague or overbred. Right. Well, let me deal with the vagueness question first, Your Honor. Especially with it's got the scienter requirements alleviate vagueness. Right. So it's true that the term animal enterprise is not unclear. And we don't argue that any of the terms in the statute are unclear. The problem is that they apply so broadly to so many crimes. Thousands could be charged under this law every year for property damage to animal enterprises because the purpose requirement is that an individual intends to damage the animal enterprise. If you throw a rock through a Whole Foods window, whether or not you're doing it because of an animal rights ideology or because you have a complaint with how they treat their workers or because you think it's too expensive, right, that is, that fulfills the elements of the crime. But none of those cases are ever charged as animal enterprise terrorism. Only property damage by animal rights activists are charged under this statute. Well, doesn't that indicate that there's no confusion about it? Well, certainly I think the prosecution is using it just as Congress intended for it to be used. But that is a problem where it applies so broadly. It's exactly the problem. Well, if nobody is confused about it. Because the fact that there's no standards mean that the prosecution can say, this is a federal law that makes it a federal crime to cause property damage, and we're only going to use this crime against 1% of the population who engages in the criminal conduct. When everybody understands that it was designed to go after people who use the animal rights thing to cause damage to others. The problem, Your Honor, is that I don't think Congress could have criminalized this conduct for the purpose of, because of the fact that the animal enterprise uses animals constitutionally. That might have given rise to a content or viewpoint discrimination problem. And I think probably the reason Congress wrote the statute broadly to not say we're only going to criminalize action undertaken motivated by this specific ideology, which is of course protected under the First Amendment, is that- Well, the First Amendment doesn't protect injury and damage. Well, of course. And that gets back maybe to the over-breath question of whether the statute is actually narrowly targeted to causing physical harm to tangible property. Which is how the government reads it, and how the district court reads it, but it's not what the statute says. Those are simply not the words of the statute. And if we look at the sort of leading prosecution under the Animal Enterprise Protection Act, which used the same language as since the law was amended, the Third Circuit interpreted causing the loss of property to include causing the loss of profits and causing increased security costs. That is incredibly broad. Now, in that case, there was a different question as to whether the First Amendment was involved, but facial over-breath doesn't require that the defendant's actions in this case were protected by the First Amendment. The over-breath doctrine exists to protect the rights of individuals who are not before the court, whose lawful activism may be chilled by the existence of a statute which criminalizes a substantial amount- Well, how is the lawful activism chilled in this case, Ms. Merrill-Klein? Well, I think we've cited some newspaper articles in our cases about animal rights activists actually struggling to understand whether causing an animal enterprise to lose profit is a federal crime under this statute. Now, of course, you and I might know that if a prosecution of that nature was actually brought where individuals protest in front of a fur store and the store loses profit and they're prosecuted under the act, I would certainly hope that that prosecution would be thrown out on First Amendment grounds. But the fact that it could- Well, particularly since the statute says it shall not be construed to prohibit any expressive conduct, including peaceful picketing or other peaceful demonstration protected by the First Amendment. Well, that's correct, Your Honor, but it's pretty hard for a lay person to understand exactly what protected conduct prohibited from prosecution of the First Amendment means. I mean, that's a question that is difficult for all of us to understand. And there- But by my understanding in the statute, isn't it in the statute, maybe I'm misreading, it says including peaceful picketing. That's not hard to understand or peaceful demonstration. Well, that's true, Your Honor, but what about pure speech? I mean, pure speech isn't peaceful picketing- Yeah, but we have debates about pure speech and what qualifies under the First Amendment all the time. That's right. I mean- But the question is whether that savings clause could possibly give individuals who are not lawyers notice of what it is that they can and cannot do. And that's why courts are so clear that a savings clause cannot save an otherwise invalid statute. And that's why the court must look to A2A, just as the district court did. I mean, the district court got it right in that they interpreted A2A first, and only after they found that it was open to two different possible interpretations did the court then look to the savings clause, which gave it further comfort. But if A2A is not actually legitimately open to two interpretations, and I would submit that there is no way that it is. There's no definition of property that excludes money. And there is no reason for the Bates or the Rosello presumption to actually apply here. There is nothing that changes the plain words of causing the loss of property, causing the loss of money, to mean anything other than what it says. Well, so in the decade that we've had the statute, your argument, as I understand it, is that there haven't been evidences of prosecutorial misuse. It's just a possible chill out there that activists don't know where the line is drawn. Well, that's right, your Honor. And in Stevens, you know, the Supreme Court— You know, at some base level, we've got to take some common sense approach here. And have there been attempts by animal rights activists to petition for the statute to be changed? I mean, what has been the evidence other than a suggestion, there's a chill, knowing that you can protest, but you can't destroy property? Well, you know, five plaintiffs did file a civil suit, a pre-enforcement challenge, seeking to have the statute struck down on its face, arguing that they were chilled. And they swore to the fact that they were chilled from engaging in lawful protected advocacy. And the court held they didn't have standing, relying on the savings clause. And certainly, we don't have any empirical evidence of how many protests have dwindled. But as someone who has contact with many people in the animal rights world, I do think this casts a palpable chill on that community. And overbreadth is— Even though it defines, it says in the statute, economic damage does not include any lawful economic disruption, including a lawful boycott that results from lawful public, governmental, or business reaction to the disclosure of information about an enterprise. So I mean, so you can shut, essentially shut down a furrier by picketing. They could have tons of lost profits. That's lawful under the First Amendment, and as I understand it, lawful under the statute. Well, what's interesting about the carve-out to the definition of economic damages is that it doesn't actually exclude causing a business to spend more money, right? That is not part of what's carved out from economic damage that can lead to increased penalty. So even if we were to try to rely on the way that certain economic damages don't count under the statute for penalty purposes, that still allows for liability and penalty based on causing a business to hire an extra security guard. Well, but it says does not include any lawful economic disruption. So an economic disruption could be, I can't pay for extra security to guard the premises, or it causes me to have more guards on duty. That would fall under economic disruption. I don't know that I agree, Your Honor, because the rest of the clause says that results from lawful public, governmental, or business reaction to the disclosure of information about an animal enterprise. And it doesn't seem to me that if a business learns of the fact that animal rights activists are going to have a picket in front of their building that day, and they hire an extra security guard, that that's an act taken in reaction to disclosure of information about the enterprise. So I don't actually think that the carve out excludes causing a business to spend more money. But nobody's been confused about it. Well, I don't know that that's the case, Your Honor. And especially, the over-breath doctrine isn't just about how the statute has been used. It's about what the statute covers. In Stevens, the Supreme Court didn't look to see has the government gone after hunting magazines to criminalize their depictions of animal cruelty. The court looked at the statute itself and said, what does this statute, by its terms, criminalize? And that's what we're asking the court to do today, to read the language of H-U-A, which does not say anything about economic damage. Economic damage, Your Honor, of course, is defined in the statute. But damaging or causing the loss of property is not defined in the statute. And there is no reason to assume that Congress didn't mean to include causing economic damage when it wrote such a broad phrase that naturally includes causing economic damage. All right. Ms. Peripold, I'm going to have to ask you, the red light's been on for a while, but we've been asking you a lot of questions, and I'll still provide you the three minutes for rebuttal. Thank you for your patience. All right. Thank you. Ms. Biesenthal. Thank you. May it please the Court, Bethany Biesenthal for the United States. The District Court did not err in denying the defendant's motion to dismiss the indictment in this case.  The AIDA is not overbroad because it does not reach a substantial amount of constitutionally protected activity. It doesn't reach a substantial amount of constitutionally protected activity because it has several limits within the language of the statute itself. Now, in listening to the defendant's arguments, they would ask the Court to parse each one of those limits and look at them individually. But the way that the statute should be read and the more fair reading of the statute is to look at it as a whole. So I ask the Court to look at these limits as a whole, not individually. And when you do, the clear reading, the fair reading of the statute is that it criminalizes the damage to property and exempts peaceful protest, picketing, and lawful demonstration. Now, the limits. First, the offense provision uses the terms any real and personal property as opposed to simply any property. So why doesn't your interpretation read out the word any like the defendant's argued? The reason that it doesn't read out the word any is because the defendant's argument actually reads out the words real and personal. If Congress had meant any property at all, any type of conceivable property that you can think of, it would include any property. It didn't. It included those modifiers real and personal property. From there, it goes on to the second limit, which is after the term any real or personal property as opposed to any property at all, it says that it must be used by the animal enterprise, which again is a clue as to what Congress intended to criminalize, which is the property that is something that is concretely used by an animal enterprise. Now the next limit is the penalty provision of the IATA, which it's the government's position that the penalty provision of the IATA, the economic damages, it informs, it's another clue as to what Congress intended to criminalize in the offense provision and that those two things should be read in combination because one informs the other. So the fact that Congress in the penalty provision expressly included economic damages, not only included economic damages, but provided its reader with a definition of what economic damages includes, but yet does not include economic damages in the offense provision indicates that it did not intend to criminalize damage solely to those economic damages. Congress then goes further and includes more information about what is and is not criminalized by the statute itself in the definition of what economic damages includes. Congress expressly exempts exactly what the defendants are concerned is chilling free picketing, lawful demonstration. It makes no sense... And so someone who has to hire an additional security guard in order, because there's picketing, there couldn't be a charge, you're saying criminally they couldn't be charged. That's right. If there is no damage to property that then necessitated that extra security guard. If it's solely having to purchase or hire a security guard as a result of lawful activity, then no, it is not covered by the IATA's criminal provision. Now if there was physical damage to property and the liability provision is triggered, then that cost may fall under the economic damages section once we get there. So if someone, for example, at the end of a peaceful protest broke glass or I mean did some... Then you might be able to tie the extra hiring of a security guard because of the damages to the property. You might, because now we have the physical property damage, which is the breaking of the glass. So we have the liability provision is triggered. So then we go to the economic damages provision. And so long as that extra security guard, the cost is not associated with the lawful demonstration but instead is associated with the illegal act of breaking the glass, then it could be included within the economic damages provision. So the two things are separate, but they inform the other. Now, the last limit that I wanted to raise is the... No, no. What counsel would say is that's not real clear from the statute that you can answer that hypothetical, but someone who was just reading the statute wouldn't get that meaning. And we disagree entirely with the defendant's position on that point. It's the government's position that when you read the statute, as opposed to parsing every single little word and coming up with a hypothetical for a situation in which one word may lead to overbreath, when you just read it as a whole, what you read is you have to purposely damage the property of an animal enterprise and you are expressly allowed to engage in lawful activity. Now, the last limit that I wanted to bring up goes to your Honor's point, which is that at the very end of the statute, Congress included one final step, which is in case there's any question here, First Amendment protected activity is not criminalized, period. So Congress makes clear through all of those different limits, which again have to be read together in a statute as a whole, as opposed to parsing out words. And when you do that, it's clear that the statute is not overbroad and it certainly does not raise substantial constitutional protected activity concerns. Before moving on to vagueness, I did want to respond briefly to counsel's comments about the individuals who did file a suit based on the fact that they believed that their freedom of speech had been chilled as a result of the statute's vagueness or overbreath, and wanted to note for the Court that in that case, and it was Plum v. Holder, the Third Circuit found that those plaintiffs did not have standing to even make that assertion because the statute was clear that there was no reason that they should be chilled in any way, that the statute very clearly exempted from its reach the conduct of which they were complaining. I think that that case is telling as to the very clear nature of what the statute does and does not reach. The District Court also rightly found that the aeda was not vague. First, in order to facially attack a statute based on vagueness, the challenge must implicate First Amendment freedoms. Now, the defendant's overbreath argument in this case does implicate First Amendment freedoms, but its argument concerning the vagueness of the statute does not. The defendants have limited their vagueness argument to the argument that the statute is so broad as to give unfettered discretion to law enforcement. That's not a First Amendment concern, and so the question before this Court, then, is whether the statute is vague as applied to the defendant's conduct, which it just simply is not. The statute is designed to criminalize exactly what happened here, which is physical property damage to an animal enterprise. The releasing of the mink, the damaging of the breeding cards, as well as the damage to the physical property of the furrier or the breeder itself. Now, even if defendants are able to assert a facial attack here, the aeda is not facially vague. It does not invite unfettered discretion for law enforcement, and instead, the statute has clear limits that Congress imposed that the reader, including law enforcement, understands exactly what is criminalized, which is physical damage to property and exempts peaceful protest or lawful demonstration. Now, the aeda has all the limits that we've just discussed that go to the overbreadth concern, and those are relevant also to determining whether it's vague, because those limits make it clear to the reader, including law enforcement, what is criminalized and what is not. But in addition, and this goes to some questions Your Honor was asking, it includes not just one but actually a double intent requirement. It includes that one travel or use interstate commerce with the intent or the purpose of damaging or interfering with an animal enterprise, intent one, and then second intent requirement, which is from there, you must actually intentionally damage or cause loss to the animal enterprise. So there's, in addition to the limits we've just described, there's also this double intent requirement. Now, counsel argued that the intent requirement really only satisfies that first prong of vagueness concern that goes to notice as to what's criminalized to the reader. But the intent requirement also does go to the vagueness concern as to whether it gives unfettered discretion to law enforcement. If law enforcement knows they have two intent requirements to prove, they know that you must travel with the purpose of damaging an animal enterprise and then intentionally damage or cause loss to the animal enterprise, that limits the number of crimes that are within its reach. It goes to the concerns that counsel's raised with the two cases that they've cited to the court this morning with Metro Produce and Dessertain, which the problem with those ordinances was the problem of who intends to actually commit this crime. The first one goes to the idling, right, of the noise violation. If a truck idles for one minute versus 30 minutes, who's actually committed that crime? Well, an intent requirement there would do something about that. If you intend to make noise, then that would rid the statute of its problem. The second statute or second ordinance that goes to using your vehicle as living quarters, the problem with that ordinance is if you simply eat in your car, you could be guilty of the ordinance, or if you're a homeless individual living in your car, you're also guilty of that ordinance. Again, this intent requirement of intending to live in your vehicle would rid the ordinance of that problem. So this double intent requirement within the IATA also rids the IATA itself of any vagueness problem. Now, with those limits, with the limits that we've described that go to the overbred concern, in addition to the double intent requirement, law enforcement is left with one conclusion in reading the statute. It criminalizes damage to property, not peaceful picketing, not lawful demonstration. Now, counsel talks about the fact that then that there's so many crimes then that fall within the reach of the IATA, but the question here is whether there's vagueness as to what constitutes that crime, whether law enforcement would have the arbitrary decision as to whether a crime has in fact been committed. The fact that the IATA covers a broad range of what otherwise would be usually state-level property crimes is not a vagueness issue at all, and it's no different than the discretion that's given to the government in determining whether to bring a prosecution based on mail fraud or wire fraud, very broad statutes that bring in a number of different crimes if the interstate commerce requirement is met. Finally, the district court rightly found that the IATA's title, its short title, does not violate the defendant's due process rights. The word terrorism, as complained of by the defendants in this case, appears in one place only, in the short title of the bill that was passed through Congress. The term terrorism does not appear as the title of the statute in the U.S. Code, and it does not appear anywhere within the statute itself. Because the word terrorism appears only in that short title of the statute, there's no real consequence at all to the defendants. They're not required to register as terrorists, and they're not automatically subjected to any type of enhanced penalty. Defendants are not labeled as anything, and there is no right that's implicated. The government is unaware of any case in which any court has ever found that there's a substantive due process right inherent within the short title of a statute as it passes through Congress. If there are no further questions from the panel. Thank you, Mr. President. The government respectfully requests that the court affirm the convictions and sentence of the defendants. Thank you. Ms. Marple. I'll try to be very brief. First, the opposing counsel brings up the question of whether a defendant can bring a facial vagueness challenge when the First Amendment is not at issue. Hoffman states clearly that a facial vagueness challenge is appropriate regardless of whether the First Amendment is at issue. It is just that in a situation such as that, the defendant must also show that the law is vague as applied to his conduct as well. In the same way it's vague applied to others not before the court. If the court agrees that ADA fails to provide proper standards to guide law enforcement discretion, then every prosecution is the same exercise of standardless discretion. So this is a statute that would be vague in every single application and a facial challenge is appropriate. Second, the government argues today for the first time that the word any isn't important in HUA because Congress used the words real or personal property instead of just property. But first of all, this is not an argument they made in their briefs or below. And second of all, it seems to me that real and personal property include the entire universe of all property. So I'm not sure why that actually changes the clear meaning of the word any, which is as clear a word as Congress can choose to use. When a business reacts to a threatened demonstration by hiring an extra security guard, that is exactly the same kind of harm that the Third Circuit recognized in Fulmer as giving rise to liability. And in the district court, in the Fulmer prosecution, the government explicitly argued loss of property includes lost profits. It includes extra security costs. The government has changed its position now that the AETA exists. But the provision itself was exactly the same in the AEPA and the government should not be able to secure a conviction based on a broad reading of a statutory provision and then argue in defense of an overbreath challenge that the words don't mean the same thing they argued the words meant previously. Fourth, government counsel indicates that the intent requirement in the AETA actually limits the reach of that statute. But I'm not sure how it does. You know, counsel didn't disagree that someone who throws a rock through the Whole Foods window who intends to injure Whole Foods because their food is too expensive is still committing a crime under the statute. So it doesn't seem to me that AETA's intent requirement actually limits the reach of the statute in any way that would cure the vagueness problem. Finally, the word terrorism in the title of the law has an impact. It makes defendants eligible for placement in a communication management unit in the Federal Bureau of Prisons. Just by virtue of that word, they will be reviewed for potential placement in one of the most restrictive units that exist in the federal prison system. And if the word terrorism can be used to describe throwing a rock through a Whole Foods window, that word has no meaning. Thank you. All right. Thank you, Ms. Miller. Cool. Thanks to all counsel. The case is taken under advisement.